# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Mindy Bender, Individually and on behalf of all others similarly situated, | Case No. 24-cv-3359 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | JURY TRIAL DEMANDED |
| AMERIPRISE FINANCIAL, INC., AMERIPRISE FINANCIAL SERVICES, LLC and AMERICAN ENTERPRISE INVESTMENT SERVICES, INC. | |
| Defendants | |

Plaintiff Mindy Bender ("Plaintiff"), on behalf of herself and all others similarly situated, brings this action as a class action against defendants Ameriprise Financial, Inc.[1] ("Ameriprise Financial, Inc.") and its broker-dealer subsidiaries Ameriprise Financial Services, LLC, dba Ameriprise Financial ("Ameriprise Financial"), and American Enterprise Investment Services, Inc. ("AEIS") (collectively "Ameriprise" or "Defendants"). Plaintiff and the members of the proposed class were at all relevant times customers of Ameriprise, a diversified financial services firm, whose cash held in its customers' brokerage accounts was subject to the Ameriprise cash sweep programs known as the Ameriprise Insured Money Market Account and/or the Ameriprise Bank Insured Sweep Account. Plaintiff alleges as follows against Defendants, based on personal knowledge as to Plaintiff and her own acts, and otherwise on information and belief, based on the investigations of her counsel, which included a review of documents created and distributed by Defendants, SEC filings, FDIC filings, and other publicly available commentary, analysis, and information. Upon information and belief, Plaintiff believes that discovery will further support the allegations in this class action complaint.

---

[1] Ameriprise Financial, Inc. is a holding company that conducts its business through subsidiaries it controls. Ameriprise Financial, Inc. is named as a defendant herein as the parent company and control person of its wholly-owned broker-dealer subsidiaries Ameriprise Financial and AEIS, and its bank subsidiary, Ameriprise Bank, FSB. Ameriprise Financial, Inc. uses the Ameriprise Financial brand as its enterprise brand, as well as the name of its advisor network and certain of its retail products and services.

## I.      INTRODUCTION

1.      This case arises out of cash sweep programs implemented by Ameriprise whereby, acting as its customers' agent and fiduciary, defendant AEIS automatically "sweeps" uninvested cash balances in its customers' accounts and deposits that cash into FDIC-insured interest-bearing bank deposit accounts. The Ameriprise cash sweep programs consist primarily of the Ameriprise Insured Money Market Account ("AIMMA") and the Ameriprise Bank Insured Sweep Account ("ABISA") (together, the "Bank Deposit Sweep Programs," or "Programs"). This action concerns only the AIMMA and ABISA Bank Deposit Sweep Programs, and not any other cash sweep options offered by Ameriprise.[2]

2.      Ameriprise implemented the Bank Deposit Sweep Programs ostensibly to offer its customers an interest paying vehicle to hold cash that offers FDIC insurance on those cash deposits. Under the AIMMA program, customer cash is automatically "swept" from the customers' accounts, then allocated to a series of banks (the "Participant Bank(s)") by Ameriprise. Customer funds are then deposited into interest-bearing FDIC insured deposit accounts at the Participant Banks.

3.      Under the terms of the AIMMA program, the Participant Banks included Defendants' affiliated bank, Ameriprise Bank, FSB ("Ameriprise Bank"), along with other

---

[2] In particular, this action excludes any money market fund sweep options that may be offered by Ameriprise to certain categories of customers. No securities were involved in the Programs, no securities were purchased or sold in connection with the Programs, and Plaintiff does not allege that any cash sweep proceeds should have been used to purchase securities.

banks not affiliated with Defendants. Ameriprise Bank was the only bank option under the ABISA program.

4.      However, while acting as its customers' agent, Ameriprise used the Bank Deposit Sweep Programs to confer outsized benefits on itself and its affiliates vis-à-vis its customers' cash by: (1) taking for itself and its affiliates the vast majority of the compensation the unaffiliated Participant Banks agreed to pay for Ameriprise's customers' deposits in violation of industry rules of practice that require that charges for any services performed by Ameriprise for its customers shall be reasonable; (2) directing the vast majority of deposits made under the Bank Deposit Sweep Programs to its affiliate, Ameriprise Bank, whereby it shifted its compensation to Ameriprise Bank at the expense of its customers and principals who receive only a minimal return on their cash deposits; and (3) concealing the benefits Ameriprise and its affiliates received from Defendants' principals' money through the use of inaccurate, misleading or oblique disclosures.

5.      Ameriprise also failed to adequately, if at all, disclose to its customers that, as to the cash sweep Programs, it was an agent serving two masters – its customers and its affiliated companies – and was shortchanging its customers for the benefit of its affiliates.

6.      Lastly, Ameriprise failed to disclose to its customers that its affiliate, Ameriprise Bank, to which it directed the majority of its customers' cash under the Programs, was not a typical bank and instead had been created and was at all relevant times operated for the primary purpose of taking advantage of the cash in Ameriprise's customers' accounts.

7.    Plaintiff brings this action individually and on behalf of a Class of similarly situated individuals for breach of fiduciary duty, gross negligence, breach of contract, violation of Minnesota's Consumer Fraud Act, violation of Minnesota's Uniform Deceptive Trade Practices Act, and unjust enrichment to recover damages arising out of Defendants' violations of the law, and for such other relief as the Court may deem just and proper.

## II.    JURISDICTION AND VENUE

8.    This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. §1332(d)(2), as this action is brought as a class action on behalf of class members, one or more members of the class are citizens of a state different than the Defendants, and the amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs.

9.    The Court has personal jurisdiction over Defendants because Ameriprise Financial, Inc. maintains its principal place of business and headquarters in this District at 1099 Ameriprise Financial Center, Minneapolis, MN, regularly transacts business in Minnesota through its wholly-owned subsidiaries, including its broker-dealer subsidiaries defendants Ameriprise Financial, and AEIS, a Minnesota corporation, and thus has minimum contacts in Minnesota and in this District.

10.    Venue is proper under 28 U.S.C. § 1391 because among other things, Defendants maintain their headquarters in this District, have offices in this District, and a substantial part of the events, omissions, and/or relevant conduct by Defendants giving rise to Plaintiff's claims occurred in this District.

### III.   PARTIES

**A. Plaintiff**

11.     Plaintiff, Mindy Bender ("Plaintiff"), was a customer of Ameriprise and is a resident and citizen of New York. Plaintiff maintained accounts with Ameriprise in which cash was held over the course of the life of the accounts. During the time period she was an Ameriprise customer, the cash held in Plaintiff's IRA account was automatically "swept" into a low-interest bearing bank account pursuant to the AIMMA program.

**B. Defendants**

12.     Defendant Ameriprise Financial, Inc., a Minnesota-headquartered corporation incorporated in Delaware, describes itself as a diversified financial services company offering financial planning and advice offering a broad range of products and services to assist individual and institutional clients achieve their financial objectives. Ameriprise Financial, Inc. is a holding company that primarily engages in business through its subsidiaries, including its broker-dealer subsidiaries Ameriprise Financial and AEIS. Ameriprise Financial, Inc. provides financial planning and advice, as well as full-service brokerage services primarily to retail clients through its financial advisors through its Advice & Wealth Management segment. Among the products and services, it offers are cash management and banking products, including brokerage sweep programs.

13.     Defendant Ameriprise Financial, a Minnesota-headquartered entity incorporated in Delaware, is a wholly owned subsidiary of Ameriprise Financial, Inc. and operates as its retail introducing broker-dealer.

14.     Defendant AEIS, a Minnesota-headquartered entity incorporated in Minnesota, is a wholly owned subsidiary of Ameriprise Financial, Inc. and operates as its clearing broker-dealer.

## IV.     FACTUAL BACKGROUND

### A. Ameriprise's Customer Relationship

15.     The relationship between Ameriprise Financial, AEIS and their customers, including Plaintiff, is set forth in the Ameriprise Brokerage Client Agreement which "contains [Ameriprise Financial's] Account Agreement and Disclosures required to open a brokerage account." The Ameriprise Brokerage Client Agreement defines "[w]e", "our" and "us" to include Ameriprise Financial and AEIS, and states that "[b]rokerage, investment and financial advisory services are made available through [Ameriprise Financial], Member FINRA and SIPC." The Ameriprise Brokerage Client Agreement incorporates by reference a document titled "Other Important Brokerage Disclosures" for "additional information" regarding, among other products and services, the Bank Deposit Sweep Programs. The Ameriprise Brokerage Client Agreement and Other Important Brokerage Disclosures are referred to collectively as the "Agreement."

16.     The Agreement expressly incorporates the rules of applicable federal, state and self-regulatory organizations including the Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority ("FINRA"). Specifically, it provides:

> **Applicable Rules and Regulations**. All transactions for your account shall be subject to the regulations of all applicable federal, state and self-regulatory agencies, including the U.S. Securities and Exchange Commission (SEC),

Financial Industry Regulatory Authority (FINRA), the Board of Governors of the Federal Reserve System, and the constitution, rules and customs of the exchange or market (and its clearing house, if any) where executed.

17.    The Agreement also contained a choice of law provision that provides, in relevant part, that the Agreement and its enforcement shall be governed by the laws of Minnesota.

### B. The Bank Deposit Sweep Programs

18.    The Ameriprise Bank Deposit Sweep Programs consist primarily of the AIMMA and ABISA Programs. AIMMA is the primary cash sweep program available to most Ameriprise accounts except for certain discretionary investment advisory accounts in tax-qualified ownerships. ABISA is "the money settlement option for discretionary investment advisory accounts in a tax-qualified ownership, and for certain non-discretionary investment advisory qualified accounts with trustee-directed pooled investment 401(a) ownership."

19.    Under the AIMMA program, AEIS, acting as its customers' agent, automatically "sweeps" cash from its customers' accounts, then allocates the cash into money market deposit accounts at the Participant Banks using the Insured Network Deposits service offered by Intrafi Network, LLC (formerly Promontory Interfinancial Network, LLC or "PIN"). Ameriprise characterizes the money market deposit account as "a type of savings deposit". – (See Agreement, "Deposit Accounts").

20.    Under the terms of the AIMMA program, the Participant Banks included Defendants' affiliated bank, Ameriprise Bank, along with other banks not affiliated with Defendants. Ameriprise Bank was the only bank option under the ABISA program.

### C. AEIS Acted as a Double Agent Regarding the Bank Sweep Programs

21.    Pursuant the Agreement, defendant AEIS acted as its customers' agent and exercised discretion regarding the establishment and operation of the Bank Deposit Sweep Programs. The Agreement specifically states that:

- AEIS will . . . open Deposit Accounts *as your agent*. . .
- AEIS*, as your agent*, will establish the Deposit Accounts for you at each Bank and make deposits to and withdrawals from the Deposit Accounts.
- When funds are first available for deposit, AEIS*, as your agent*, will deposit available cash balances in your brokerage account into your [money market deposit account] and a linked [transaction account] at one or more of the Banks on the then-current Bank List. . .
- All withdrawals necessary to satisfy debits in your brokerage account *will be made by AEIS as your agent*.
- *AEIS is acting as your agent* in establishing the Deposit Accounts at each Bank, depositing funds into the Deposit Accounts, withdrawing funds from Deposit Accounts and transferring funds among Deposit Accounts.
- Deposit Account ownership will be evidenced by a book entry on the account records maintained by AEIS *as your agent*.

(Emphases added).

22.    At the same time AEIS was acting as its customers' agent in connection with the Bank Deposit Sweep Programs, it was also beholden to its affiliates, Ameriprise Financial, Inc., Ameriprise Financial, and its affiliate bank, Ameriprise Bank. Defendants acknowledged the conflict of interest in the Agreement but failed to either fully disclose it or explain it, as required to obtain informed consent from its customers, and claimed to address it "through a combination of disclosures and policies and procedures regarding Sweep Program availability and the free-credit balance."

### D. The Bank Deposit Sweep Programs Were Established by Ameriprise to Benefit Ameriprise, Not Its Customers

23.     The Ameriprise Bank Deposit Sweep Programs, by design and operation, primarily benefited Ameriprise and its affiliates, at the expense of its customers, as alleged below.

24.     Regardless of the Participant Bank chosen by AEIS, Ameriprise benefited itself by keeping the vast majority of the compensation each Participant Bank agreed to pay Ameriprise for the use of those customer funds.

25.     First, regarding the unaffiliated Participant Banks, the fee Ameriprise kept for itself at the expense of its customers/principals was not reasonable. The Agreement illustrates that point:

> **Fees Paid to AEIS**
> For AIMMA, each Bank will compensate AEIS for the placement of funds based on the average daily deposit balance at that Bank. The total compensation paid by each participating Bank to AEIS is negotiated, and is based on either the Federal Funds effective rate or the one or three month London Interbank Rate (LIBOR), plus up to 100 basis points (i.e., 1.00%). Of this amount, PIN may receive compensation from AEIS of up to 10 basis points as a service provider for AIMMA. **AEIS retains the balance of the amount paid by the Participating Banks, less the amount of interest paid to you and the compensation to PIN.**

(Emphasis in original.)

26.     The above disclosure is misleading in that it implies that all of the Participant Banks pay the same compensation to AEIS; in fact, they do not. It is also inconsistent with the disclosure later in the Agreement that Ameriprise Bank "does not compensate AEIS for its sweep services provided or for the cash deposits held at Ameriprise Bank, but

reimburses AEIS for its direct out of pocket expenses related to AIMMA." As alleged below, Ameriprise Bank keeps the "spread" between what it earns and the nominal amounts it pays to Ameriprise's customers, but that amount - which is substantial and far in excess of the customers' compensation – is not disclosed.

27.    The Agreement then provides the following outdated example[3] to illustrate the split:

> For AIMMA, if the participant bank holding your cash sweep balance has agreed to pay AEIS the Federal Funds Rate plus 0.20%, and the Federal Funds Rate is 2.15%, AEIS would receive 2.35% on your cash balance. If you are credited with interest of 0.35% on your cash balance, AEIS would retain 2.00, from which it would pay its vendor and retain the rest as compensation for operating the sweep program. To give you an idea of the compensation AEIS earns from this program, we will provide you with a range of rates AEIS has negotiated with participating banks as a point of time. As of November 5, 2018, the rates paid by banks in the program were within a range of 2.25%-3.25%, but depending on movement of interest rates, this range could be higher. . .

28.    Based on the outdated example from November 2018, Ameriprise would receive 2.35% from the unaffiliated Participant Banks for use of Ameriprise's customer money, credit the customer .35% (14.9% of the total), pay its vendor up to .235% (10% of the total), and retain the rest—1.76% or over 75% of the total—for itself. This purported disclosure, however, was of little use to Ameriprise customers regarding then-current market conditions.

29.    Plaintiff alleges that while the fee AEIS kept for itself from unaffiliated Participant Banks was unreasonable, in violation of industry rules of practice – especially

---

[3] This example is from the December 2021 (12/21) Agreement. Later versions of the Agreement did not include a similar example.

when it had to do very little to earn that money – those amounts were far below what Ameriprise earned by directing customer cash to its affiliated bank, where Defendants stood to make far more money compared to what Defendants received from the unaffiliated Participant Banks.

30.     In operation, Defendants directed the vast majority of deposits made under the AIMMA program, and 100% of the deposits under the ABISA program to Ameriprise Bank. While the Agreement did disclose the split between Ameriprise and its customers for amounts paid by the unaffiliated Participant Banks, it concealed how much Ameriprise and/or its affiliates actually make from Defendants' principals' money when it is swept to Ameriprise Bank. Instead, the Agreement misleadingly states that Ameriprise Bank "does not compensate AEIS for its sweep services provided or for the cash deposits held at Ameriprise Bank, but reimburses AEIS for its direct out of pocket expenses related to AIMMA." Similarly, the Agreement states that Ameriprise Bank will not compensate AEIS for ABISA, "but will reimburse AEIS for its direct out of pocket expenses related to the sweep services provided." In reality, however, Ameriprise Bank was making a substantial amount of money on Ameriprise's customers' cash, and AEIS conferred a substantial benefit on its affiliate, Ameriprise Bank, by foregoing such compensation at the expense of its customers/principals without disclosing that amount and without explaining to its customers – whose agent it was – its conflict of interest and the fact that it chose to forego its compensation to one of its masters at the expense of the other.

31.    In fact, the only disclosure regarding what Ameriprise Bank earns on Ameriprise customers' "swept" money consists of the definition of the "spread" between what Ameriprise earns and what it pays out:

> The banks participating in AIMMA earn income by lending or investing the deposits they receive and charging a higher interest rate to borrowers, or earning a higher yield that the banks pay on the deposits held through AIMMA. The difference is known as the "spread." Like unaffiliated banks participating in AIMMA, Ameriprise Bank earns spread revenue when it participates in AIMMA.

32.    While remaining silent as to how much the benefit Ameriprise Bank actually receives – and saying nothing about the amount or percentage of compensation that AEIS foregoes and passes back to Ameriprise Bank, rather than its customers – the Agreement provides an oblique and incomplete disclosure about AEIS and Ameriprise Bank's "combined revenue":

> Generally, the combined revenue earned by our affiliate, AEIS and Ameriprise Bank is expected to be: (i) the highest when your account sweeps cash into AIMMA where Ameriprise Bank is utilized as a Program Bank; (ii) the second highest when your account sweeps cash into AIMMA where unaffiliate Program Banks are utilized; and (iii) the lowest when your account sweeps cash into an eligible money market mutual fund. Our affiliates AEIS and Ameriprise Bank use this revenue to defray the cost of operating our Sweep Programs and the expense of providing other services to our clients, as well as for general operating expenses and to provide net earnings to AEIS and Ameriprise Bank. In the absence of this revenue Ameriprise Financial Services would likely charge higher fees or other charges to clients for the services AEIS and Ameriprise Bank provide to clients.

33.    Thus, Ameriprise's customers are only told that Ameriprise receives "the highest" amount when it sweeps cash to its affiliated bank, but they are not informed what

that amount is, i.e., of the significant benefit AEIS shifted to its affiliated bank at the expense of its principals.

**E.    Ameriprise's Disclosures to Its Customers Regarding the Bank Deposit Sweep Programs Contained Material Misrepresentations and Omissions**

34.    In addition to the misrepresentations and omissions identified above, Ameriprise's disclosures contained additional misrepresentations and omissions of material facts. For example, the Agreement stated as follows regarding the rate of return that alternatives to the Bank Deposit Sweep Programs might pay:

> AEIS is not obligated to offer alternative sweep investments that offer a rate of return that equals or is greater than other comparable investments. Regardless of the sweep options made available, you will always be able to buy and sell certain money market mutual funds; brokered certificates of deposit; treasury bills; and other similar products to manage cash in your account. These alternative options for the investment of cash balances *may* offer higher returns than the sweep options made available to you.

(Emphasis added).

35.    The statement in paragraph 34 was false and misleading because, as Defendants knew at the time, alternative products *will* offer a higher rate of return, not *may* offer a higher rate of return.

36.    In addition, the Agreement stated as follows regarding the "balance targets" Ameriprise sets under the Insured Network Deposits service:

> The balance targets Ameriprise Bank establishes with PIN *may* result in Ameriprise Bank securing a higher position on the Bank List, and thus receive higher deposits than other Participant Banks.

(Emphasis added).

37.     The above statement was false and misleading because, as Defendants knew at the time and thereafter, the balance targets Ameriprise sets ensures that Ameriprise Bank *will* for certain secure a higher position on the Bank List, and thus receive higher deposits than other Participant Banks.

### F. Ameriprise's Disclosures to Its Customers About Ameriprise Bank and Its Role in the Programs Contained Material Misrepresentations and Omissions

38.     In addition to the misrepresentations and omissions identified above, Ameriprise's disclosures contained additional misrepresentations and omissions of material facts about Ameriprise Bank's role in the Bank Deposit Sweep Programs.

39.     More specifically, the Agreement characterized Ameriprise's affiliate, Ameriprise Bank, as just another bank enrolled in its cash sweep Programs, competing for cash deposits from Ameriprise customers just like the other banks that participated in the Programs. The Agreement further characterized the "spread" made by Ameriprise Bank in similar terms as such "spread" made by the other banks involved in the Programs.

40.     Ameriprise, however, failed to disclose to its customers that it was directing the majority of its customers' cash in the Programs to Ameriprise Bank. Ameriprise also failed to disclose that Ameriprise Bank was anything but a regular bank like the other banks. Instead, Ameriprise Bank was at all relevant times operated primarily to take advantage of the cash in Ameriprise's customers' accounts, which was directed to it through the Bank Deposit Sweep Programs. This rendered Ameriprise a servant with two masters, beholden primarily not to its customers but to Ameriprise Bank. Indeed, most

Ameriprise Bank's assets – approximately 90% if not higher – is cash received from Ameriprise's customers' accounts pursuant to the Programs.

41.     Additionally, while Ameriprise characterizes Ameriprise Bank's "spread" on the cash in the Programs in terms similar to those of the "spread" of other banks in the Programs, it failed to disclose that Ameriprise Bank's "spread" is far higher because of the fees on its customer's cash in the Programs that Ameriprise chooses to forgo and transfer to Ameriprise Bank instead of its customers, while retaining such fees from all other banks in the Programs, whose "spread" is thus significantly lower than that of Ameriprise Bank. Such misrepresentations and omissions keep Ameriprise's customers uninformed about Ameriprise's conflict and the fact that it favors its affiliated bank at the expense of its customers.

42.     Unbeknownst to Ameriprise's customers in the Programs, Ameriprise Bank functions as a highly profitable arbitrage operation of Ameriprise, taking advantage of the nearly-free cash funneled to it by Ameriprise as agent of its customers pursuant to the Programs, and retaining for itself the vast majority of the profits it generates with that cash.

## V.     CLASS ACTION ALLEGATIONS

43.     Plaintiff re-alleges and incorporates by reference the allegations set forth above.

44.     Plaintiff brings this action individually and as a class action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class consisting of: All persons who held cash positions in accounts custodied by Ameriprise, and whose cash was subject to Defendants' Bank Deposit Sweep Programs.

45.     Excluded from the Class are governmental entities, institutional and other non-retail investors; Defendants and any of its affiliates, legal representatives, employs, or officers; the judicial officer(s) and any judicial staff overseeing this litigation; and counsel for Plaintiff and the proposed Class, including other attorneys and staff at each respective firm.

46.     Plaintiff reserves the right to amend the Class definitions if further investigation and discovery indicates that the Class definition should be narrowed, expanded, or otherwise modified.

47.     This action has been brought and may be maintained as a class action under Federal Rule of Civil Procedure 23.

**A.  Numerosity - Rule 23(a)(1)**

48.     Class members are so numerous that their individual joinder is impracticable. The precise number of Class members and their identities are unknown to Plaintiff at this time. However, defendant Ameriprise's wealth management services oversee $1.4 trillion in client assets through the work of approximately 10,000 financial advisors driving approximately 85% of Ameriprise's revenues, and Plaintiff believes that the members of the proposed Class number in the thousands. Accordingly, Plaintiff and the Class satisfy the numerosity requirement of Rule 23. Class members may be notified of the pendency of this action by mail, published notice, or other appropriate methods.

**B.  Existence and Predominance of Common Questions of Law and Fact - Rule 23(a)(2), 23(b)(3)**

49.     Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual Class members. These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following, whether:

a.      Defendants owed fiduciary duties to Plaintiff and the putative Class members in connection with the Programs;

b.      Defendants breached their duties to Plaintiff and the putative Class members in establishing, maintaining, and/or operating the Programs;

c.      Defendants' disclosures about the Programs and/or Ameriprise Bank contained material misrepresentations or omissions;

d.      Defendants breached their contract with Plaintiff and the putative Class members regarding the Programs;

e.      Defendants were unjustly enriched by their wrongful conduct;

f.      this case may be maintained as a class action under Fed. R. Civ. P. 23;

g.      and to what extent Class members are entitled to damages and other monetary relief; and

h.      and to what extent Class members are entitled to attorneys' fees and costs.

**C.  Typicality - Rule 23(a)(3)**

50.     Plaintiff's claims are typical of the claims of the Class because she was a customer of Defendants that had her cash balances improperly managed by Ameriprise through its administration of the Bank Deposit Sweep Programs. Thus, Plaintiff's claims are typical of the claims of the members of the Class as the claims arise from the same

course of conduct by Defendants, and the relief sought within the Class is common to the members of each.

**D. Adequacy of Representation - Rule 23(a)(4)**

51.    Plaintiff will fairly and adequately protect the interests of Class members. Plaintiff has retained counsel competent and experienced in complex class action litigation, and Plaintiff will prosecute this action vigorously. Plaintiff has no interests adverse or antagonistic to those of the Class.

**E. Superiority - Rule 23(b)(3)**

52.    A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members are small compared with the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would thus be virtually impossible for the Class members, on an individual basis, to obtain effective redress for the wrongs done them.

53.    Even if Class members could afford individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

54.     Additionally, the Class may be certified under Rule 23(b)(1) and/or (b)(2) because:

a.      the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants;

b.      the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

c.      Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

## VI.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### BREACH OF FIDUCIARY DUTY
**(Asserted on behalf of the Plaintiff and the Class against Defendants)**

55.     Plaintiff repeats and incorporates by reference the preceding factual allegations as if fully set forth herein.

56.     At all relevant times, Defendants owed fiduciary duties to Plaintiff and the members of the Class in connection with the Programs. Such duties independently arose out of (1) the agency relationship between defendant AEIS, on one hand, and Plaintiff and

the members of the Class on the other hand, as to the Programs; (2) Ameriprise's holding and control over beneficial funds that belonged to its customers, related to their cash sweep balances; (3) Ameriprise's discretion as to the Programs and its customers' cash, while acting as their agent; and/or (4) the applicable industry standards. As a fiduciary to Plaintiff and the Class, Defendants owed them the highest duties of loyalty, candor, due care, and prudence in as to the services it provided to them in connection with establishing, maintaining, and/or operating the Programs. Moreover, as a fiduciary, Defendants had a continuing duty to act exclusively for the benefit of Plaintiff and the Class in connection with establishing, maintaining, and/or operating the Programs. Lastly, as a fiduciary, Defendants had a continuing duty to obtain ***informed*** consent from Plaintiff and the Class regarding the Programs, and specifically make sufficiently detailed disclosures regarding the Programs, its role, the role of various related parties, and any conflicts of interest to obtain such informed consent.

57.    Defendants further owed Plaintiff and the Class the fiduciary duty to act in good faith in connection with establishing, maintaining, and/or operating the Programs.

58.    Defendants further owed Plaintiff and the Class the duty to charge reasonable fees for its services related to the Programs.

59.    Plaintiff and the Class were fully dependent upon Defendants' ability, skill, knowledge, and goodwill with respect to Defendants' Programs.

60.    Defendants owed Plaintiff and the Class similar duties by virtue of its control over Defendants' policies or management regarding the Programs.

61.     Defendants breached their fiduciary duties by the conduct alleged herein, including by designing, structuring, and/or operating the Programs to benefit itself at the expense of its fiduciary customers, making material misrepresentations and omissions regarding the Programs, violating its duty of care, and acting in its own – not its customers' – best interest vis-à-vis the Programs.

62.     Defendants violated their duty of loyalty by, among other things, putting their interest above that of their fiduciary customers, failing to provide sufficient information to their fiduciary customers regarding material features of the Programs to obtain **_informed_** consent from them, and not properly disclosing their own and their affiliates' role in, and conflicts of interest arising out of the Programs, as more fully shown above.

63.     As a direct and proximate consequence of Defendants' conduct as alleged herein, Plaintiff and the Class suffered damages in an amount to be determined at trial, and seek disgorgement of any undue and unjust gains of Defendants, as well as all other equitable relief deemed just and proper.

## SECOND CAUSE OF ACTION
### GROSS NEGLIGENCE
**(Asserted on behalf of the Plaintiff and the Class against Defendants)**

64.     Plaintiff realleges and incorporates by reference the preceding factual allegations as if fully set forth herein.

65.     Defendants owed Plaintiff and the putative Class, all of whom were its fiduciary customers vis-à-vis the Programs, certain duties related to its establishment, maintenance, and operation of the Programs.

66.    Those duties arose out of (1) the agency relationship between defendant AEIS, on one hand, and Plaintiff and the members of the Class on the other hand, as to the Programs; (2) Defendants' holding and control over beneficial funds that belonged to its customers, related to their cash sweep balances; and (3) the applicable industry standards.

67.    Ameriprise's duties to its customers included establishing, maintaining, and/or operating the Programs for the benefit of its customers, not for its own benefit; negotiating reasonable interest rates for its customers' cash with the Program Banks; and charging reasonable fees for its Programs-related services. Moreover, Ameriprise had a duty make sufficient disclosures to its customers regarding the Programs as needed for those customers to give ***informed*** consent regarding the Programs.

68.    Defendants owed Plaintiff and the Class similar duties by virtue of its control over Defendants' policies or management with regard to the Programs.

69.    Defendants breached their duties by the conduct alleged herein, including by designing, structuring, and/or operating the Programs to benefit themselves at the expense of their customers, making material misrepresentations and omissions regarding the Programs, violating their duty of care, acting in their own – not their customers' – best interest vis-à-vis the Programs, failing to negotiate reasonable interest rates for its customers' cash with the Participant Banks, and failing to charge reasonable rates for their services.

70.    Defendants were not merely negligent; as more fully shown above, they were grossly negligent because their self-serving conduct showed the want of even scant care and/or was an extreme departure from the ordinary standard of conduct.

71.    Defendants' gross negligence directly and proximately caused harm to Plaintiff and the members of the proposed Class.

### THIRD CAUSE OF ACTION
### UNJUST ENRICHMENT (IN THE ALTERNATIVE)
**(Asserted on behalf of the Plaintiff and the Class against Defendants)**

72.    Plaintiff realleges and incorporates by reference the preceding factual allegations as if fully set forth herein.

73.    In the alternative, Defendants have received and retained a benefit from Plaintiff and the members of the proposed Class, and inequity has resulted.

74.    Defendants benefited through their unjust conduct by sweeping available cash balances from their customers' accounts in the Programs into bank accounts selected for the benefits they offered to Defendants, not their customers, and retained most of the interest generated by those cash balances.

75.    Plaintiff alleges that it is inequitable for Defendants to retain these benefits.

76.    Plaintiff alleges that because of Defendants' conduct, the amount of their unjust enrichment should be disgorged in an amount to be proven at trial.

### FOURTH CAUSE OF ACTION
### BREACH OF CONTRACT (IN THE ALTERNATIVE)
**(Asserted on behalf of the Plaintiff and the Class against Defendants)**

77.    Plaintiff repeats and realleges each of the factual allegations in the forgoing paragraphs as if fully set forth herein.

78.    Plaintiff asserts this cause of action for breach of contract in the alternative.

79.    Defendants' relationship with its customers is governed by a written contract, the terms of which are contained in, and incorporated into various standardized documents drafted by Defendants.

80.    One such document is the Agreement. To become a customer of Defendants, each member of the proposed Class must agree to the terms of this document.

81.    The Agreement expressly incorporates the rules of applicable federal, state and self-regulatory organizations including the SEC and FINRA. Specifically, it provides:

> **Applicable Rules and Regulations**. All transactions for your account shall be subject to the regulations of all applicable federal, state and self-regulatory agencies, including the U.S. Securities and Exchange Commission (SEC), Financial Industry Regulatory Authority (FINRA), the Board of Governors of the Federal Reserve System, and the constitution, rules and customs of the exchange or market (and its clearing house, if any) where executed.

82.    FINRA Rule 2122 expressly provides that "[c]harges, if any, for services performed. . .shall be reasonable and not unfairly discriminatory among customers."

83.    Pursuant to the Agreement, defendant AEIS undertook to act as an agent of the customers in the establishment, maintenance, and operation of the Programs and were thus contractually obligated to obtain for Plaintiff and members of the proposed Class rates of return on their cash balances that are reasonable.

84.    As set forth herein, the fees charged by Defendants for the administration of the Programs were excessive and the rates of return paid to customers on their cash balances were not reasonable. Accordingly, Defendants breached their contracts with Plaintiff and the members of the proposed Class.

85. Plaintiff and the members of the proposed Class were harmed by Defendants' breach.

### FIFTH CAUSE OF ACTION
**VIOLATION OF MINN. STAT. § 325F.69**
**(Consumer Fraud Act enforced through Minn. Stat. § 8.31 and § 325F.70)**
**(Asserted on behalf of the Plaintiff and the Class against Defendants)**

86. Plaintiff realleges and incorporates by reference the preceding factual allegations as if fully set forth herein.

87. In connection with establishing, maintaining, and/or operating the Programs, Defendants acted, used, or employed fraud, unfair or unconscionable practices, false pretenses, false promises, misrepresentations, misleading statements, or deceptive practices with the intent that others rely thereon.

88. Defendants' unlawful practices include designing, structuring, and/or operating the Programs to benefit itself at the expense of its fiduciary customers, making material misrepresentations and omissions regarding the Programs, and breaching fiduciary duties by the conduct described herein.

89. Plaintiff and members of the proposed Class have been harmed as a result of the conduct described herein.

### SIXTH CAUSE OF ACTION
**VIOLATION OF MINN. STAT. § 325D.44**
**(Uniform Deceptive Trade Practices Act)**
**(Asserted on behalf of the Plaintiff and the Class against Defendants)**

90. Plaintiff realleges and incorporates by reference the preceding factual allegations as if fully set forth herein.

91.     Defendants engaged in deceptive trade practices when, in the course of business, Defendants represented that the Programs have characteristics, uses, or benefits that they do not have and engaged in other conduct which similarly created a likelihood of confusion or misunderstanding.

92.     Plaintiff and members of the proposed Class have been harmed as a result of the conduct described herein.

## VII.    PRAYER FOR RELIEF

Plaintiff requests relief as follows:

1.      Actual damages;

2.      Injunctive relief prohibiting Defendants from continuing to engage in the conduct alleged herein;

3.      Attorneys' fees and costs of suit;

4.      Prejudgment interest; and

5.      Such other relief as the Court deems just and proper.

## VIII.  DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims so triable.

DATED: August 21, 2024                  Respectfully submitted,

                                        BERGER MONTAGUE PC

                                         /s/John G. Albanese
                                        _____
                                        E. Michelle Drake, Bar No. 0387366
                                        John G. Albanese, Bar No. 0395882
                                        1229 Tyler Street NE, Suite 205
                                        Minneapolis, MN 55413

T. 612.594.5999
F. 612.584.4470
emdrake@bm.net
jalbanese@bm.net

Michael Dell'Angelo
(pro hac vice forthcoming)
Andrew D. Abramowitz
(pro hac vice forthcoming)
Alex B. Heller
(pro hac vice forthcoming)
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
mdellangelo@bm.net
aabramowitz@bm.net
aheller@bm.net

Alan L. Rosca, Esq. (OH 0084100)
(pro hac vice forthcoming)
Jonathan A. Korte, Esq. (FL 126450)
(pro hac vice forthcoming)
ROSCA SCARLATO LLC
2000 Auburn Dr. Suite 200
Beachwood, OH 44122
Telephone: (216) 946-7070
E-mail: arosca@rscounsel.law
 jkorte@rscounsel.law

Paul J. Scarlato, Esq. (PA 47155)
(pro hac vice forthcoming)
161 Washington Street, Suite 1025
Conshohocken, PA 19428
Telephone: (216) 946-7070
E-mail: pscarlato@rscounsel.law

*Counsel for Plaintiff and the Proposed
Class*

27